Action for divorce. At the trial in January, 1970, plaintiff testified that she was 36 years old. Defendant testified that he was earning approximately $17,000 a year, and that his wife was working during and since the marriage and was earning approximately $8,000 a year. The parties had no children.
Harry B. Frank, J.
Plaintiff wife sues for a judgment of divorce on the ground of cruel and inhuman treatment under subdivision (1) of section 170 of the Domestic Relations Law.
The parties were married in this city on November 28, 1964 and thereafter, in either December, 1966 or January, 1967, they relocated to the Congo by reason of defendant’s employment with the United States Information Agency. Plaintiff testified that while the parties were in the Congo, and particularly during the month of May 1967, defendant falsely accused her of having had an affair with one M, a man whom plaintiff had known and dated while she was in high school. Plaintiff indicates that as a result of defendant’s accusations of adulterous conduct she required the services of a physician who ultimately advised her to leave for home because of these marital problems. She further testified that defendant bought her a ticket for the United States and that she left the Congo in July, 1967 while defendant remained there. Thereafter the parties remained apart except for brief periods in November, 1967 and April, *272 1968 when defendant returned from the Congo on leave and the parties cohabited in an attempt to ‘ ‘ patch things up ’
The period of' their separation, from July 31, 1967 on, is marked by innumerable letters written by the parties to each other and to third persons. The letters of particular significance insofar as they bear upon plaintiff’s cause of action are those written by the defendant in March, April and May of 1968. In a letter to plaintiff, dated March 27, 1968, defendant charged: “ You had an affair with Ricky ”. Defendant’s letter to plaintiff, dated April 11, 1968 included the following: “ In both my letters to you and to Issacharoff I point blank accused you of having an adulterous affair with Ricky. This is not a hazy area, you either did, or you did not. Your rather obvious refusal to deny this makes me certain that it is true, and that it is being continued now — today. There is no reason in the world why a woman would not deny an affair if it would help her marriage. You’re a good woman. Just double everything I said earlier in the letter. I assure you, if you don’t return the ring and give the statement to the bank, you will regret it to your dying day.” In a letter dated a day earlier, that is, April 10, 1968, defendant had concluded with the statement: “ You are a thief, a liar, an adulteress, and on top of everything else, a fraud. ’ ’ That letter is largely concerned with financial matters and made certain demands upon plaintiff regarding bank accounts and return of her engagement ring and included the threat that ‘ ‘ If you do not do the following things immediately, I will take brutal actions against you: I will inform your parents and brother of all the details of the marriage; I will inform Marymount ”,
Thereafter, on May 15, 1968, defendant did write to plaintiff’s brother, at length, setting forth various allegations about her alleged contacts with M and stating that: ‘ ‘ Apparently Helen married me with the conscious intention of continuing to see M. * * * and married me with the intention of continuing the affair.” A similar sort of letter, dated May 22, 1968, was sent by defendant to Mrs. Ryan, a friend with whom plaintiff had been staying.after her return to the United States. That letter contained the statement: “ If you feel I have told you this to blacken her reputation, that is your opinion, to which you are entitled ”. Defendant further admitted in his testimony that a letter containing similar charges had also been sent by him at about the same time to the President of Marymount College where plaintiff was employed.
The instant action was originally instituted in January of 1969. The original answer, verified by defendant in October, 1969, contained an affirmative defense averring that defendant 11 never *273 at any time accused the plaintiff of committing adultery or having adulterous affairs ’ ’, and that ‘ ‘ plaintiff has on divers occasions falsely charged and in the complaint in this action has repeated the false charge that the defendant has accused her of having adulterous affairs.” He further charged that plaintiff ‘1 by falsely charging the defendant with making accusations of adultery has been guilty of cruel and inhuman treatment of the defendant ’ ’ by reason of which he counterclaims for a divorce. An amended complaint was thereafter served in November, 1969 to which defendant responded by an amended answer, verified on December 4,1969, which is substantially the same as the original answer insofar as it contains an affirmative defense denying the making of the accusations of adultery. Unlike the original answer, however, the amended answer contains no counterclaim. On the trial, which was vigorously defended, defendant stated that he still loves his wife, does not want a divorce and is seeking a dismissal of the complaint.
Notwithstanding defendant’s verified averments in both the original and amended answer that he 1 ‘ never at any time accused the plaintiff of committing adultery or having adulterous affairs ”, his own letters to plaintiff dated March 27, 1968, April 10 and April 11,1968 do in fact expressly contain precisely such accusations, the first charging that she ‘ ‘ had an affair with Ricky”, the second unequivocally stating “You are * * * an adulteress ”, and the last setting forth that in prior letters to plaintiff and to her psychiatrist ‘ ‘ I point blank accused you of having an adulterous affair with Ricky. ’ ’ Moreover, the letters sent to third persons, including plaintiff’s brother and Mrs. Ryan, while not necessarily using the word ‘ ‘ adultery ’ ’ make clear that it is precisely such conduct that plaintiff is being charged with and such letters are replete with the sort of innuendo and insinuation that are most damaging. (Cf. Sherman v. Sherman, 103 N. Y. S. 2d 374, affd. 279 App. Div. 888, affd. 304 N. Y. 911.)
The charge of infidelity in the marital relation, made by a husband against his wife either to herself or others, constitutes cruel and inhuman treatment, in the absence of a justifiable belief on the part of the husband that such charges are true. (See Israel v. Israel, 54 App. Div. 408; Generous v. Generous, 197 Misc. 651; Leutloff v. Leutloff, 47 Misc 2d 458.) While, prior to the revision of our matrimonial laws effective September 1,1967, such conduct would only have sufficed to provide grounds for a separation, such is pow also a ground for divorce under subdivision (1) of section 170 of the Domestic Relations Law, and the same criteria would apply in determining whether such ground *274 has been sufficiently established as the basis for a divorce as was heretofore applied in the case of a separation. (See Mante v. Mante, 34 A D 2d 134,137-138.)
Though an assertion of adultery directed toward a spouse is unconnected to actual physical violence, the courts have considered it such an indignity, so destructive of the marital relation, that it renders further cohabitation improper. (Mante v. Mante, supra; cf. Generous v. Generous, supra.)
Where, however, the charge of infidelity is made by one who has reasonable grounds for suspecting his spouse of infidelity and who acts in good faith, the making of the accusation does not constitute 1 ‘ cruel and inhuman treatment ’ ’ within the contemplation of the statute. (See 16 N. Y. Jur., Domestic Relations, 766, p. 311; Sherman v. Sherman, supra.) While defendant in this case contends that the statements made by him were justified, the record fails to sustain any such conclusion.
Plaintiff satisfactorily established that defendant’s accusations were unwarranted. She testified that her first contact with M after high school was an accidental meeting on the street in 1963, and that she thereafter saw him at her office on several occasions in connection with some art work on brochures which he was doing for the travel agency where she worked. She denied having any contact with him beyond these casual business encounters and indicated that her social meetings with him were limited to a single luncheon engagement at which a female coemployee was also present.
Defendant, on the other hand, failed to submit any proof which would demonstrate a reasonable basis for charging plaintiff with adulterous conduct involving M. His testimony with regard to morning phone calls and nebulous statements regarding plaintiff’s ostensible attitudes regarding a friend’s extramarital dating, even if accepted, would fall far short of a reasonable foundation upon which to justify charges of infidelity with the person specified. Indeed, the lack of any reasonable basis for making such charges in the first instance is demonstrated by defendant’s own letters. After the making of such accusations, he concludes that plaintiff’s failure to deny such “ makes one certain that it is true ’ ’, since according to his reasoning there “ is no reason in the world why a woman would not deny an affair if it would help her marriage ”. While defendant’s letters manifest an almost compulsive desire to have plaintiff admit to adultery, in light of the estrangement then existing between the parties and the many previous denials by plaintiff which fell on deaf ears, as indicated by defendant’s own letter of May 15, 1968, her failure to respond to a particularly timed accusa *275 tion of infidelity fails to give rise to the inference which defendant seeks to draw. Moreover, the defendant’s testimony reflected such a blatant contempt for the truth that it can be accorded no credence whatsoever and it is rejected in its entirety including his self-serving assertions as to admissions and opinions expressed by the plaintiff. One illustration of his cavalier disregard for accuracy, consistent with the pattern of misstatements contained in the answers, was his insistence that he had responded to plaintiff’s conciliatory letters prior to August 30, 1967 despite the fact that his letter of that date clearly states: “ I haven’t written because I have nothing to add after 3 years of talking ’ ’. A further indication of his low truth threshold is his casual admission in his letter dated March 27, 1968 that “ I sent in the 1966 tax last November, with your name forged ”.
Far from establishing either justification or provocation for the charges of infidelity made by defendant, the record demonstrates that such charges were predicated on nothing more substantial than the conjectural fantasies of a jealous husband (cf. Sherman v. Sherman, supra), and there is no credible evidence in the record which establishes any facts from which a reasonable person could conclude that plaintiff was guilty of adulterous conduct as charged by defendant.
Defendant has also raised the issue of condonation by reason of the parties’ cohabitation for a short period during April, 1968. This was subsequent to the dates of the letters charging adultery which defendant had sent to plaintiff in March and early April of 1968. In this case where the period of cohabitation was admittedly of very brief duration and was in the hope of 1 ‘ patching things up ”, it would not establish condonation of the cruel and inhuman treatment relied upon as the basis for the action herein. (See Fisher v. Fisher, 223 App. Div. 19, affd. 250 N. Y. 313; Fusaro v. Fusaro, 236 N. Y. S. 2d 525, affd. 18 A D 2d 714; Pellegrino v. Pellegrino, 66 N. Y. S. 2d 297.) In any event, whether or not the brief period of cohabitation in April constituted condonation is not decisive in this case in view of the allegations in the letters thereafter sent by defendant to third persons. Even though misconduct which would entitle a spouse to a judicial separation on the ground of cruel and inhuman treatment has been condoned, subsequent acts of cruel and inhuman treatment will revive the condoned misconduct, although not of themselves sufficient to justify a judicial separation, and the prior condonation will not operate as a defense to an action for a separation based upon such misconduct. (16 N. Y. Jur., Domestic Relations, § 821, p. 358; 1 Foster and Freed, Law and the Family, § 15:17, p. 563.)
*276 Upon all the foregoing, the court finds that defendant’s accusations of infidelity were made without justification and that such conduct on defendant’s part constitutes cruel and inhuman treatment within the contemplation of the statute. The record and the numerous exhibits herein indicate, without question, that this is indeed “ a dead marriage ”. To deny the relief sought, as defendant urges, would be to frustrate what this State’s highest court has determined to be “ the legislative recognition that it is socially and morally undesirable to compel couples to a dead marriage to retain an illusory and deceptive status and that the best interests not only of the parties but of society itself will be furthered by enabling them ‘ to extricate themselves from a perpetual state of marital limbo. ’ ” (Gleason v. Gleason, 26 N Y 2d 28, 35.)
Insofar as alimony is concerned, the court has already indicated that, by reason of the limited duration of the marriage, the economic history of the marriage, plaintiff’s age and her own earning capacity, alimony will not be awarded herein. (See Phillips v. Phillips, 1 A D 2d 393, affd. 2 N Y 2d 742.)
With respect to counsel fees, however, an award is clearly warranted in light of the vigorous defense of the action and the various procedural maneuvers instituted by defendant. Under all the circumstances herein, and giving due consideration to the sum already paid by plaintiff, counsel fees are awarded in the sum of $2,500.