*549 OPINION OF THE COURT
Herbert A. Posner, J.
This matter was originated by the petitioner, Harold Frankel (hereinafter referred to as Frankel), for a CPLR article 75 judgment to confirm an arbitration award against the Kissena Jewish Center (hereinafter referred to as Center).
After a number of days of hearings, further motions, cross motions, etc., the parties entered into a stipulation on March 6, 1989. In this stipulation, Frankel agreed to withdraw his petition for confirmation of an arbitration award, subject to a vote by the general membership of the Center on Sunday, March 26th, at 10:30 a.m. At such meeting, the general membership, eligible to vote, would decide whether the dispute between Frankel and the Center should be submitted de novo to a new arbitration panel. Both parties requested the court to recommend an individual who would serve as "Referee” at this meeting. Both sides admitted that on all prior occasions the acrimony and hostility that existed between the opposing factions of the Center prevented an orderly and conclusive decision on the issue — whether or not to retain Frankel as the rabbi for the Center.
The three-to-four-hour general membership meeting was held on March 26th and a vote was taken on a resolution as to whether the "Rabbi’s tenure should be resubmitted for final determination by a panel of three Orthodox Rabbi’s to act as a Beth Din”. The Referee submitted a report to the court, signifying that the resolution was carried by a vote of 23 to 21. There is now before the court a motion by the respondent challenging the Referee’s report and demanding that four proxy votes (which were not included by the Referee in the count) should be counted against the resolution; and therefore, the resolution be considered defeated by a vote of 25 to 23.
Respondent Center bases its argument on a two-step approach. Center contends that section 609 of the Not-For-Profit Corporation Law requires proxy voting and disallows it only where there is a prohibition in the certificate of incorporation or the bylaws. Therefore, the Referee exceeded his authority in disallowing the votes; and furthermore, he could not serve as a Referee since that would be a violation of section 251-a of the Judiciary Law which prohibits a law secretary from acting as a Referee.
Section 609 of the Not-For-Profit Corporation Law reads as follows:
*550 "(a) Except as otherwise provided in the certificate of incorporation or the by-laws:
"(1) Every member entitled to vote at a meeting of members or to express consent or dissent without a meeting may authorize another person or persons to act for him by proxy.”
The Center’s argument fails for the following reasons:
(1) Both sides requested the court to appoint an individual to act as Referee for the meeting. Both sides were informed by the court that the individual to be appointed would be a law secretary to another Supreme Court Justice. Center’s attorney specifically stated on the record that "The word 'Referee’ in this stipulation means that the gentleman appointed by the Court, or the gentlelady, will be acting to make rulings on issues of parliamentary questions and on questions of law and order, conduct of members at meetings, so that to insure the meeting is orderly in scope.” This court can think of no other issue that is more parliamentary in scope than proxy voting. Whether proxy votes are to be adiriitted is a question of parliamentary procedure to be determined by the institution’s certificate of incorporation or bylaws. Therefore, the Referee’s report, which was based on his examination and interpretation of the Center’s constitution (equivalent to bylaws), is within the scope of his accepted authority. As a matter of fact, the Referee ruled against Frankel’s supporters when it came to an interpretation of whether three officers of the Center were eligible to vote or not. The Referee’s rulings fell impartially for and against both sides during the course of the meeting. Where parties to a lawsuit chart their own course and fashion the basis upon which a particular controversy will be resolved, they are bound by it even though the results so reached may be contrary to law and fact. (Mitchell v New York Hosp., 61 NY2d 208; Matter of McGirr v Division of Veterans Affairs, 56 AD2d 653, affd 43 NY2d 635, cert denied 439 US 826.) Likewise, Center’s argument that the appointment of the Referee violated section 251-a of the Judiciary Law fails for similar reasons. Having accepted the Referee, with full knowledge of his background, the losing party cannot now avail itself of a statutory issue, which is not jurisdictional in nature. (See, Matter of Scinta v Scinta, 129 AD2d 262; Fisher v Fisher, 223 App Div 19.) In Fisher, the court stated (at 21), "He could not await the outcome, and if it were in his favor abandon the claim of disqualification, and if decision were against him, assert its existence. A party waives any disqualification not involving corruption by proceeding with *551 the reference after the cause for disqualification has become known to him.” Furthermore, this court does not believe that section 251-a of the Judiciary Law applied to the facts herein. A careful reading of the section makes it clear that the disqualification of a Referee, who is in the employ of a Judge, is referring to matters within the scope of judicial authority and on court time. A membership meeting of a religious corporation on a Sunday certainly is neither on court time nor within the scope of court business. It would be highly improper, and in violation of the First Amendment of the US Constitution for the State to appoint an official Referee in a situation of this nature. In all respects, the law secretary who acted as a Referee for this meeting was serving in an unofficial capacity on his own personal time.
Even if the Referee’s report was subject to judicial review, the court finds the Referee’s factual and legal reasoning to be eminently correct.[1]
Section 2-b (1) (a) of the Religious Corporations Law states: "1. The not-for-profit corporation law applies to every corporation to which this chapter applies, provided that:
"(a) If any provision of the not-for-profit corporation law conflicts with any provision of this chapter, the provision of this chapter shall prevail and the conflicting provision of the not-for-profit corporation law shall not apply in such case. If any provision of this chapter relates to a matter embraced in the not-for-profit corporation law but is not in conflict therewith, both provisions shall apply.”
Section 207 of the Religious Corporations Law requires proxy voting only when the congregation is voting "on any proposition to sell, mortgage or lease any of its property or for its consolidation with one or more religious corporations of the Jewish faith, or, in a city having a population of one million or more according to the latest federal census, in any election of trustees or officers.”
This language is not in conflict with the Not-For-Profit Corporation Law, which permits proxy voting at any type of membership meeting, "[e]xcept as otherwise provided in the certificate of incorporation”. (Not-For-Profit Corporation Law § 609 [a]; emphasis added.)
*552 The Center’s constitution mentions proxy voting in only one section, and that is in the negative. Article 7, section 3, dealing with the election of officers, states "No absentee or proxy ballots will be allowed and no person may vote unless he is present at the election meeting.” Does express prohibition on one particular area mean that proxy voting is permitted in all other areas? A further analysis of the Center’s constitution is required. Article 20, section 1 states: "Any matter not provided for in this Constitution shall be subject to the provisions of Robert’s Rules of Order.”
Robert’s Rules of Order § 44 clearly disallows proxy voting:
"absentee voting.
"It is a fundamental principle of parliamentary law that the right to vote is limited to the members of an organization who are actually present at the time the vote is taken in a legal meeting. Exceptions to this rule must be expressly stated in the bylaws.” (Op. cit., at 355.)
"proxy voting.
"A proxy is a power of attorney given by one person to another to vote in his stead; the term also designates the person who holds the power of attorney. Proxy voting is not permitted in ordinary deliberative assemblies unless the laws of the state in which the society is incorporated require it, or the charter or bylaws of the organization provide for it. Ordinarily it should neither be allowed nor required, because proxy voting is incompatible with the essential characteristics of a deliberative assembly in which membership is individual, personal, and non-transferable.” (Op. cit., at 360.)
Respondent has made no claim that proxy voting has ever been utilized or permitted at any past congregational meeting. It is therefore assumed by the court that this is the first instance in the congregation’s history when an attempt was made to utilize proxy voting. Obviously, it would be unfair, without a stipulation between two parties, to permit one party unilaterally to come to an important meeting of this nature[2] and to present four proxy votes. If the respondent had wished *553 to use proxy voting, an agreement for both sides to do so should have been inserted in the original stipulation.
In conclusion, the motion to disallow the Referee’s report is denied and the parties are instructed to abide by their stipulation and submit their differences to Judaism’s own time-honored dispute resolution technique, known as the "Beth Din”.

. As an aside, a few weeks after the Referee submitted his report to the court, he received a nomination for judicial office and will most likely be elevated to the Bench in January of 1990. If his behavior and judicial reasoning can be portended by his activities as a Referee in this case, the judicial system will be rewarded by his presence.

. Rabbi Frankel had been the Center’s rabbi for over 20 years and was seeking life tenure in accordance with his claim that such was required under the tenets of Jewish law. It is obvious from the tenor of the membership meeting on March 26th that the congregation was split almost evenly amongst those members who "loved” him or "disliked” him vociferously. Such a meeting, by its nature, would call for extensive deliberation. Who can tell how many congregants were swayed to vote one way or the other based upon the arguments presented at the meeting?